**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 3:18-379** |
| **VINCENT JOHN INGINO** | : | **(JUDGE MANNION)** |
| **Defendant** | : | |

## MEMORANDUM

### I.   INTRODUCTION

Presently before the court is the defendant Vincent John Ingino's ("Ingino") motion to suppress incriminating statements he made to the Pennsylvania State Police ("PSP") because, as he alleges, he was subjected to a custodial interrogation without being advised of his *Miranda*[1] rights. (Doc. 22; Doc. 23, at 7). Based on the following, Ingino's motion (Doc. 22) shall be **DENIED**.

### II.   BACKGROUND

On November 13, 2018, Ingino was indicted on two counts of distribution and possession with intent to distribute a controlled substance.

---

[1] *Miranda* rights refers to the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), which inform a suspect of the right to be silent and the right to counsel in a custodial interrogation.

(Doc. 1). The charges stem from drug transactions that resulted in the death of two individuals. (Doc. 1). Ingino pleaded not guilty to the charges against him on November 26, 2018. (Doc. 11).

On March 25, 2019, Ingino filed the present motion to suppress statements he made to Pennsylvania State Police ("PSP") on September 17, 2018. (Doc. 22). On April 18, 2019, the government filed its brief in opposition to Ingino's suppression motion. (Doc. 26). Ingino filed a reply brief on April 29, 2019. (Doc. 27). On July 15, 2019, this court held a hearing on the suppression motion. (Doc. 32). The motion is now ripe for disposition.

## III.    FINDINGS OF FACT

At the suppression hearing, the court heard testimony from four witnesses: Sarah Donald ("Donald"), a probation officer at the Monroe County Probation and Parole Department, who was assigned to Ingino; PSP Troopers Jonathan Bailey ("Trooper Bailey") and Justin Leri ("Trooper Leri"), who were investigating Ingino for drug transactions; and Lindsey Hartman ("Hartman"), Ingino's girlfriend. The following facts are taken from their

testimony, the evidence introduced at the hearing, Ingino's motion, and the parties' briefs and exhibits.[2]

Between August 11 and 12, 2018, two individuals in Monroe County, Pennsylvania were found deceased and toxicology testing indicated that both died with a mixture of heroin, fentanyl, and, in one case, acetyl fentanyl present in their bodies. On August 13, 2018, Ingino failed to report to Monroe County Probation for his appointment with Donald on an unrelated matter. On August 24, 2018, Ingino reported for his rescheduled appointment with Donald, but she told him to return in one week after he had completed his drug and alcohol assessment. Ingino reported one week later, tested positive for opiates, and admitted that he had used drugs. Donald told Ingino to seek treatment and report back to her once he successfully completed it.

On September 6, 2018, Trooper Leri contacted Donald requesting Ingino's address, which she gave to him. On September 12, 2018, Donald texted Ingino and asked him to contact her by 12:00 p.m. that day. Having failed to hear from Ingino, Donald contacted her office's field team unit requesting a visit of Ingino's home. On September 14, 2018, Trooper Bailey accompanied the field team officers' visit to Ingino's home. This was the first

---

[2] The following represents the facts that the court credits upon consideration of the testimony and evidence.

time that Donald learned that Ingino was under investigation for the deaths of the two Monroe County individuals, who died on August 11 and 12, 2018. After the officers and Trooper Bailey searched Ingino's home, they left a letter with Ingino's girlfriend, Hartman, indicating that Ingino was to report to the probation office on September 17, 2018, at 2:00 p.m. for an appointment with Donald. Donald relayed the appointment time and location to PSP in the event that PSP wanted to speak with Ingino,

Ingino reported for the meeting and tested positive for controlled substances. Donald advised Ingino that she would be filing a violation by the end of the week and that he would receive a letter in the mail with his court date for the violation. Donald explained to Ingino that if he did not show up for his court hearing, a bench warrant would be issued for his arrest. In her testimony, Donald acknowledged that she did not have the power to arrest Ingino. Donald also testified that Ingino did not appear to be under the influence of drugs or alcohol during their meeting.

From her office, Donald saw Troopers Bailey and Leri arrive, and informed Ingino that they were there to speak with him. Ingino did not ask any questions and replied, "okay." Donald testified that Ingino did not offer any resistance toward speaking with the troopers. Donald did not provide Ingino with any instruction as to whether he had to speak with the troopers.

Then, Donald and a co-worker with whom she shared her office left, and Troopers Bailey and Leri went into Donald's office to speak with Ingino. Donald did not tell Troopers Bailey and Leri that Ingino had just tested positive for controlled substances.

### IV. LEGAL STANDARD

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495, (1977). However, when law enforcement officers subject someone to a "custodial interrogation," they are required to read the individual his *Miranda* rights prior to questioning, advising him of the Fifth Amendment privilege against self-incrimination. *Miranda*, 384 U.S. at 467-68. When questioning by law enforcement does not rise to the level of a "custodial interrogation," officers "are not required to administer *Miranda* warnings." *Mathiason*, 429 U.S. at 495.

A suspect is "in custody" when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). When, as in the present case, a suspect is not under arrest, the question becomes whether a reasonable

person in the suspect's situation would feel free to end the questioning and leave. *See Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004).

Where no formal arrest was made and a court needs to determine whether a suspect was "in custody" when questioned, the court should consider (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

## V.   DISCUSSION

The question presented herein is whether Troopers Bailey and Leri's questioning of Ingino rose to the level of a "custodial interrogation," thus triggering the *Miranda* rights requirement.

At no time during the questioning at issue was Ingino placed under arrest. On the contrary, several times throughout the interview the troopers told Ingino that he would be going home that day. At the suppression hearing, Ingino raised an issue about the fact that both troopers testified that the first time they told Ingino that he would be going home that day was prior to

turning on the recording device. However, upon review of the recording and in considering the bearing and demeanor of Troopers Bailey and Leri during their testimony at the suppression hearing, the court credits their account that, at the beginning of the interview, they explained to Ingino that he was free to leave and would be going home that day regardless of what he told them. Moreover, the court notes that the troopers repeated that sentiment twice more on the recording, during the questioning.

Ingino also argues that his statement to Troopers Bailey and Leri was "made only moments following a positive drug test, which was a violation of his conditions of supervision." (Doc. 23, at 5). However, none of the testimony or evidence presented indicated that Troopers Bailey and Leri knew about Ingino's drug test results at the time of the questioning. In fact, both troopers testified that they did not find out until afterward that he had failed the urinalysis. (Doc. 35, at 66, 100-01).

Further, the implication that Ingino felt he was unable to leave the questioning because of his positive drug test results was credibly disputed by Donald's testimony at the suppression hearing. After informing Ingino of his positive drug test results, Donald told him that she **would be** filing a violation and that he **would receive** a letter in the mail with a court date for his violation. Donald's only statement to Ingino relating to arrest was when

she informed him that *if* he did not show up for the court hearing, **then** a bench warrant **would be issued** for his arrest. Donald never expressed or implied that she or anyone else would arrest Ingino that day and, moreover, Donald acknowledged that she did not have the power to arrest anyone. All of Donald's statements to Ingino about the violation related to future events.

Whether Ingino felt that he would be arrested at his upcoming court appearance is not relevant here as that is outside the pertinent time period of the questioning at issue. The present inquiry is whether a reasonable person in Ingino's position would have felt that he was not free to leave on September 17, 2018. Despite the defendant's girlfriend's testimony at the hearing, suggesting that Ingino did not believe he would be returning home from the September 17, 2018 meeting, given the clear instructions provided by Donald to Ingino related to the violation, no reasonable person would have felt unable to end the interview merely because it took place following a positive drug test.

This result may have been different if Ingino reasonably believed that he was going to be arrested at the meeting due to his violation. However, under the facts presented here, the court finds that Donald's communications with Ingino about his violation debunk the theory that a reasonable person in

Ingino's position would feel unable to end the questioning because of the positive drug test results.

Troopers Bailey and Leri questioned Ingino for approximately thirty minutes in Donald's office.[3] While the interrogation lasted only thirty minutes, the fact that Ingino was questioned at a location where he was required to report merited the grant of a suppression hearing. Nevertheless, the government has met its burden of establishing that Ingino's statement was voluntary. *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) ("The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary.").

On September 17, 2018, Ingino was required to report for a meeting with Donald at the probation office at 2:00 p.m., which he did. At the mandatory meeting, Ingino spoke with Donald, underwent a urinalysis, received positive results, and was informed that a violation would be filed against him in the future. It was only after all of this occurred, that Troopers

---

[3] Ingino states that "immediately following his urinalysis, [he] was led to a conference room in the probation office where he was blindsided by two PSP troopers waiting to surprise him . . . ." (Doc. 27, at 2). This is contradictory to all other references and testimony relating to this event, which indicate that Ingino was questioned in Donald's office. Considering Ingino argues this point only once in his reply brief and did not contest the testimony indicating that the questioning took place in Donald's office, the court finds that Ingino's present assertion lacks credibility.

Bailey and Leri arrived at the probation office, the court finds, under the factual circumstances here, Ingino's mandatory meeting with Donald concluded prior to his questioning by the troopers.

Additionally, Donald's actions upon the arrival of the troopers further indicated that her meeting with Ingino had concluded prior to the interview. First, Donald privately advised Ingino that the troopers were there to speak with him. She did not walk him into a conference room where he was ambushed by the troopers, as Ingino states in his reply brief. In her testimony, Donald admitted that she did not inform Ingino as to whether he needed to speak with the troopers; however, no evidence was presented indicating that she was required to do so. Ingino did not ask Donald any questions or offer any resistance to speaking with the troopers, but simply replied, "okay," indicating his consent to speak with them. Next, Donald went to welcome the troopers and walked them to her office to speak with Ingino. Immediately thereafter, Donald and her co-worker walked away and left the troopers with Ingino. Donald did not go back into her office with the troopers. Therefore, because the mandatory meeting here had concluded prior to the questioning and because none of Donald's actions implied that the troopers' questioning was part of the mandatory meeting, this court concludes that the

location of the interview at the probation office does not weigh in favor of suppression.[4]

Similarly, the court does not find that the troopers employed coercive tactics during the questioning. The court has listened to the recorded interview and agrees that the troopers did not raise their voices or use a hostile or coercive tone of voice. Further, the court credits Trooper Bailey's and Trooper Leri's testimony that they were dressed in business attire, that they did not display their guns or physically restrain or block Ingino's movement in any way, and that the door to the office was never locked. Trooper Bailey testified, "I was sitting behind the desk with the Defendant sitting in front of me in a chair, and Trooper Leri was sitting behind an adjacent desk. So the Defendant was sitting like in a chair in front of both of us while we were behind desks." With respect to Ingino's proximity to the door, Trooper Bailey stated, "[Ingino] was sitting across from the doorway. It's easily in plain sight." (Doc. 35, at 53). When asked whether there was

---

[4] Moreover, in *Minnesota v. Murphy*, 465 U.S. 420, 430-34 (1984), the Supreme Court declined to find a violation of the Fifth Amendment even where a suspect's probation officer, who could compel the suspect's attendance and truthful answers, consciously sought incriminating evidence from the suspect about prior crimes during a mandatory meeting in the probation officer's office and threatened revocation of his probation if the suspect was untruthful. Accordingly, the court declines to find that the mere fact that the interview took place in Douglas's office requires a finding that it was custodial in nature.

any obstacle in the way of Ingino walking out the door, Trooper Bailey testified, "No. We were sitting to the Defendant's left and right behind the desk, and the doorway is like in the middle in front of him." *Id.* Thus, the court finds that Ingino was free to leave the room and that nothing the troopers did or said suggested that they would have prevented Ingino from leaving, had he decided to do so.

In support of his argument that the troopers used coercive tactics, Ingino cites Trooper Leri's statement that Ingino could either be prosecuted in federal court, in which case Ingino could face twenty years of incarceration, or in county court, where he would face substantially less time, and his suggestion that Ingino had some measure of input depending upon his willingness to cooperate. Ingino also cites Trooper Leri's statement, "We've been doing this a long time, all right? But it's kind of at the point where you could probably help yourself a little bit or you can't. I mean, if you want to see your kid grow up or don't want to see your kid grow up, this is entirely up to you at this point." (Doc. 26, Ex. A). However, given that this statement was legally correct, the court does not find that it, in and of itself, was sufficient to overcome Ingino's free will or convert the questioning into a custodial interview.

Finally, the court is satisfied that Ingino voluntarily submitted to the questioning. As noted above, Ingino said "okay," when told by Douglas that the troopers were there to question him. There is no evidence he did or said anything demonstrating resistance to be questioned, nor did he ask any questions. Although Ingino cites Trooper Leri's statements that Ingino looked "sick," "didn't look too hot," and that he appeared to have a "problem," both troopers testified that they were well-familiar with the signs and symptoms of intoxication and that Ingino did not appear to be under the influence of drugs during the interview. (Doc. 35, at 47-48, 54, 87-88). Further, in response to the Trooper Leri's observation that Ingino "didn't look too hot," Ingino explained that he was sweating because he felt the office was warm and he was wearing two sweatshirts since he had been working in a freezer.

Additionally, Ingino did not slur his words or sound incoherent during the interview. In fact, Ingino sounded calm and cooperative and, as the government points out and the court recalls from listening to the tape recorded statement, he was able to recall with specificity phone numbers, dates, locations, and details surrounding the events in question. Contrary to Ingino's assertion, the mere fact that his drug test was positive for opiates

does not mean that Ingino was intoxicated <u>during</u> the interview.[5] Given the

credible testimony of Donald, Trooper Bailey, and Trooper Leri, all of whom

testified that they did not believe Ingino was intoxicated, as well as the court's

own review of the tape recorded statement the court finds that Ingino's

submission to the questioning was voluntary.

## VI.    CONCLUSION

In summary, in considering the five factors for determining whether a

suspect was "in custody" during questioning, the court finds that all factors

weigh against suppression of Ingino's statement in the present case.

Namely, the troopers did not tell Ingino that he was under arrest and

---

[5] Even if Ingino had established that he had taken the opiates on the day of the questioning, as the court noted in *United States v. Overington*, No. 07-147, 2007 WL 3119843, at *5 n.5 (E.D.Pa. Oct. 24, 2007), "numerous courts have found waivers valid despite the fact that a defendant had received pain [or taken] medication. *See, e.g., United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002) (finding a waiver valid where a defendant 'had been shot twice . . . had been on heavy pain medication immediately after the shooting, and . . . had little contact with the outside world while in the hospital' because there was no proof of FBI agent misconduct); *United States v. Byrne*, 83 F.3d 984, 989 (8th Cir. 1996) (upholding a waiver despite evidence that the defendant was under the influence of methadone because the interrogating officer stated that the defendant 'was coherent, composed and cooperative, although somewhat subdued, during the interrogation'); *United States v. George*, 987 F.2d 1428, 1430 (9th Cir.1993) ('[A] defendant can voluntarily waive his *Miranda* rights even when he is in the hospital, on medication, and in pain.')."

indicated that he was free to leave and would be going home; the location of the interview was not coercive; the thirty-minute length of the interview suggests it was not overly long; the troopers did not use coercive tactics; and the credible testimony of record suggests that Ingino submitted to the questioning voluntarily and was aware that he would be going home that day.

Accordingly, Ingino's motion to suppress (Doc. 22) shall be **DENIED**. An appropriate order shall issue.

s/ *Malachy E. Mannion*

**MALACHY E. MANNION**
**United States District Judge**

**DATE: November 14, 2019**
18-379-01